30 P.3d 269

**In the Interest of Jane DOE, Born on December 21, 1982.**

**No. 21875.**

Intermediate Court of Appeals of Hawai'i.

July 20, 2001.

Theodore Y.H. Chinn, Chief Judge, Deputy Public Defender, on the briefs, Honolulu, for Defendant–Appellant.

James M. Anderson, Associate Judge, Deputy Prosecuting Attorney, City and

County of Honolulu, on the briefs, Kailua, for Plaintiff–Appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by BURNS, C.J.

Defendant–Appellant Jane Doe (Jane), born on December 21, 1982, appeals the August 5, 1998 Findings of Fact and Conclusions of Law; Order Adjudicating Minor a Law Violator entered by District Family Court Judge John Bryant. Based on the Hawai'i Supreme Court's April 30, 2001 opinion in *In re Jane Doe, Born on June 16, 1983,* 96 Hawai'i 73, 26 P.3d 562 (2001), we affirm.

## BACKGROUND

On April 22, 1998, Plaintiff–Appellee State of Hawai'i, through its Department of Education (DOE) and Department of the Attorney General, filed a petition (First Petition) alleging that Jane, then age fifteen, was absent from her high school classes, without excuse, for thirty days between November 24, 1997, and April 21, 1998, thereby bringing her within the family court's jurisdiction pursuant to Hawai'i Revised Statutes (HRS) § 571–11(2)(c) (1993).[1]

HRS § 571–11(2)(C) states, in relevant part, as follows:

**Jurisdiction; children.** Except as otherwise provided in this chapter, the [family [2]] court shall have exclusive original jurisdiction in proceedings:

. . . .

(2) Concerning any child living or found within the circuit:

. . . .

(C) Who is neither attending school nor receiving educational services required by law whether through the child's own misbehavior or nonattendance or otherwise[.]

1. The April 22, 1998 Petition also alleged that Jane Doe's father was incarcerated in Texas.

2. Hawai'i Revised Statutes (HRS) § 571–2 states, in relevant part, as follows: "When used in this

On May 14, 1998, the family court held a hearing and entered its first Findings, Order, and Decree, which noted that Jane had admitted the allegations of the First Petition and, thus, adjudicated her under HRS § 571–11(2), placed her under the protective supervision of the family court, the DOE, and the State of Hawai'i Department of Health (DOH), and ordered her to continue individual counseling until clinically discharged, participate in substance abuse assessment and treatment, and return to school on May 18, 1998.

On May 14, 1998, the family court signed the family court's form of the Rules of Protective Supervision and Order (May 14, 1998 RPS and Order) which ordered, in relevant part, as follows:

While you are under this protective supervision, you are to follow these rules, and any added rules set forth below:

1. You are to obey laws of the City and County of Honolulu, State of Hawaii and U.S. Government. Failure to do so may change your status to that of **"LAW VIOLATOR."**

. . . .

4. You must attend your classes at school regularly, unless excused by the school or this Court. At school you are not to behave in any manner which might cause you to be suspended or expelled.

. . . .

6. You are not to remain away from your residence overnight without first having permission from your parent(s), guardian(s), or foster parent(s).

. . . .

**IF YOU FAIL TO OBEY THE ABOVE RULES, IT MAY BE NECESSARY FOR THE COURT TO TAKE FURTHER ACTION.**

(Emphases in the original.)

On May 26, 1998, a probation officer filed a second petition (Second Petition) alleging that Jane had failed to attend school on May

chapter, unless the context otherwise requires: 'Court' means one of the family courts as herein established."

22, 1998, thereby violating Rule 4 of the May 14, 1998 RPS and Order. On that same day, the family court held a hearing and entered its second Findings and Order Regarding Detention; Initial; and Order and Decree (Second Order). The Second Order noted that Jane admitted the allegation of the Second Petition and was, thus, adjudicated under HRS § 571–11(2), ordered the protective supervision to continue, ordered Jane and her mother (Mother) to cooperate with any and all DOE and DOH treatments and recommendations, ordered Jane to remain in treatment until clinically discharged, ordered Jane and Mother to meet with "Dr. Gingerich"[3] to contract for Jane's return home, ordered Jane to live with Mother rather than Jane's boyfriend, restrained and enjoined Jane from contacting her boyfriend unless accompanied by Mother, and ordered Jane to cooperate with a drug assessment as arranged by the YMCA Outreach program.

On June 24, 1998, a probation officer filed a third petition (Third Petition) alleging that Jane remained away from her home without parental consent on June 18, 1998, thereby violating Rule 6 of the May 14, 1998 RPS and Order.

On June 24, 1998, the family court held a hearing and entered its third Findings and Order Regarding Detention; Initial; and Order and Decree, which noted that Jane admitted the allegation of the Third Petition and was, thus, adjudicated under HRS § 571–11(2), continued the protective supervision and all existing orders, and further ordered that Jane remain in detention until,

at the discretion of the facility's director, she was transferred to "Home Maluhia."

On July 16, 1998, a probation officer filed a fourth petition (Fourth Petition) alleging that Jane failed to return home and remained away from home without parental consent between July 10 and 15, 1998, thereby violating Rule 6 of the May 14, 1998 RPS and Order.

At the July 16, 1998 hearing on the Fourth Petition, Jane's counsel represented to the family court that Jane had read and understood the allegation in the Fourth Petition and wished to enter an admission. At that point, the court stated; "Well, I'm going to dismiss the petition. I'm going to request that the prosecuting Attorneys file criminal Contempt of Court against you for violating the Court order."[4] Jane's counsel responded, "Your Honor, I'll have to object to that because you'll be turning the minor into a law violator[.]" The court responded that Jane was out of control and pregnant and that her use of the narcotic, methamphetamine, endangered both herself and her unborn child. The court continued in effect all existing orders, dismissed the Fourth Petition, detained Jane in the Detention Home,[5] and scheduled a hearing for the next morning.

On July 17, 1998, a petition by the deputy prosecuting attorney (Contempt Petition) was filed alleging that Jane violated Rule 6 of the May 14, 1998 RPS and Order from July 10, 1998, through July 14, 1998, thereby com-

---

**3.** The record indicates that "Dr. Gingerich," to whom the court referred, is Karla J. Gingerich, M.S., Psychology Resident, Kapi'olani Counseling Center.

**4.** HRS § 571–8.5(6) (Supp.2000) grants district family judges the power to "[e]nforce decrees and judgments and punish contempts according to law[.]"

**5.** "Detention Home" is a temporary detention facility where a child is taken pursuant to HRS § 571–31(b)(3) (1993) "if the child's immediate welfare or the protection of the community requires it, or the child is subject to detention for violation of a court order of probation or protective supervision."

HRS § 571–32(e) (1993) states that if there is probable cause to believe that the child is a status offender,

the child may be held, following a court hearing, in a shelter but may not be securely detained in a detention facility for juveniles for longer than twenty-four hours, excluding weekends and holidays, unless the child … is allegedly in or has already been adjudicated for a violation of a valid court order, as provided under the federal Juvenile Justice and Delinquency Prevention Act of 1974, as amended.

HRS § 571–48(2) (1993) governs the placement of a child adjudicated a status offender under HRS § 571–11(2) (1993). HRS § 571–48(1) (1993) governs the placement of a child adjudicated a law violator under HRS § 571–11(1) (1993). Only the latter permits placement in a Hawai'i youth correctional facility.

mitting the offense of Contempt of Court, HRS § 710–1077.[6]

At the July 17, 1998 hearing, Jane pled not guilty. Jane's counsel objected to the Contempt Petition on the ground that Jane should be treated as a status offender, not a law violator. Jane stated, "I didn't know it was gonna like change to this. I thought it was how it was the last time. I didn't know it was a criminal act."

A trial on the Contempt Petition was held on July 28, 1998. Mother testified that Jane was away from home without parental consent from July 10, 1998, through July 14, 1998.

A family court officer with the Juvenile Intake Division testified that on May 14, 1998, she explained to Jane each line of the Protective Order and that Jane signed the document "to acknowledge that [the court officer] went over it with [Jane]." With respect to Rule 1, the court officer testified that she told Jane "that if she gets arrested for anything it could change status from a status offender to that of a law violator."

Jane testified that "Contempt of Court" was never mentioned to her.

Following the evidentiary phase of the trial, Jane's counsel argued that (1) the family court did not have jurisdiction to convert a status offense into a law violation by utilizing the contempt of court statute, and (2) Jane could not be prosecuted for criminal contempt because she had not been informed that her violation of a rule of the Protective Order could result in a contempt charge.

The court ruled that the material allegations of the Contempt Petition had been proved beyond a reasonable doubt, adjudicated Jane a law violator under HRS § 571–11(1), placed Jane on probation, and ordered that she continue with drug treatment until clinically discharged.

On August 4, 1998, Jane moved for reconsideration on the grounds that (1) the court erred in "bootstrapping" a violation of a Rule of Protective Supervision into a law violation by means of filing the Contempt Petition and (2) that Jane had no notice that a violation of

a Rule of Protective Supervision was criminal contempt.

On August 5, 1998, the family court entered its "Findings of Fact and Conclusions of Law; Order Adjudicating Minor a Law Violator." On August 11, 1998, the family court denied Jane's motion for reconsideration.

## STANDARDS OF REVIEW

■ Conclusions of law are reviewed *de novo* under the right/wrong standard of review. *Raines v. State*, 79 Hawai'i 219, 222, 900 P.2d 1286, 1289 (1995). Under this standard, the appellate court is not required to give any deference to the trial court's conclusion. *Dan v. State*, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994).

## DISCUSSION

### 1.

Jane contends that the family court's Findings of Fact (FsOF) failed to set forth the particular circumstances of the offense of Contempt of Court for which Jane was adjudicated, and thereby violated HRS § 710–1077. We disagree.

■ HRS § 710–1077(5) (1993) specifically states, "Whenever any person is convicted of criminal contempt of court or sentenced therefor, the particular circumstances of the offense shall be fully set forth in the judgment and in the order or warrant of commitment." The Hawai'i Supreme Court added that "[t]his is required whenever there is a conviction for criminal contempt of court, not only in cases where imprisonment is imposed. Oral findings are not enough to satisfy the mandate of the statute." *State v. Hicks*, 71 Haw. 564, 567, 798 P.2d 906, 907 (1990).

The family court's FsOF state, in relevant part, as follows:

2. The Court took judicial notice, under Rule 201 of the Hawaii Rules of Evidence, of the records and files in FC–J No. 98–14730, including the Findings, Order and Decree and the Rules of Protective Super-

---

**6.** HRS § 710–1077 (1993) states the offense of criminal contempt of court.

vision and Order, both issued by the Honorable Paul T. Murakami on May 14, 1998.

3. The Court heard the testimony of [Mother]. Mother testified that [Jane] remained away from [Jane's] residence overnight ... from July 10, 1998 to July 14, 1998; [Jane] did this without first having permission from Mother. ...

4. Court Officer Letty Rombaoa of the Juvenile Intake Branch of the Family Court of the First Circuit testified that on May 14, 1998 she met with [Jane]. During the meeting, Ms. Rombaoa went over each of the Rules of Protective Supervision issued on May 14, 1998 by the Honorable Paul T. Murakami (hereinafter "Rules") including Rule 6 with [Jane]; [Jane] signed said Rules at the bottom of the form. Ms. Rombaoa told [Jane], *inter alia,* that if she ran away from home, Mother could call it in as a runaway, and [Jane] could be brought back to court. ...

5. [Jane] testified that she was in court on May 14, 1998 when the Honorable Paul T. Murakami issued the order of protective supervision, and that on that same date Ms. Rombaoa explained · the Rules to [Jane]. [Jane] related that Ms. Rombaoa told [Jane] that a violation could result in [Jane] being returned to Court; [Jane] testified that contempt of court was not specifically mentioned by Ms. Rombaoa. [Jane] testified that during the time period that she was away from her residence, [Jane] was at her boyfriend's house.

. . . .

13. The evidence is clear that [Jane] was aware of the May 14, 1998 orders of the Honorable Paul T. Murakami, and that the Rules were explained to [Jane] by Court Officer Rombaoa.

14. The State of Hawaii has proven beyond a reasonable doubt that [Jane] violated the May 14, 1998 orders of the Honorable Paul T. Murakami.

15. [The] State has proven all of the elements of the offense of Contempt of Court beyond a reasonable doubt.

Jane's point is that "the findings recited what the witnesses testified to at the hearing. Recitation of testimony is not finding of the court. Accordingly, the instant case should be remanded to the Family Court for findings in accordance to the mandate of [the] statute defining the offense of criminal contempt. *State v. Lloyd,* 88 Hawai'i 188, 964 P.2d 642 (1998)."

■ We agree that the family court's statement of the evidence, by itself, is not its finding of fact. However, although we do not recommend doing it this way, we conclude that FsOF nos. 13, 14, and 15 validly convert the family court's statements of the evidence into its findings of fact. These latter findings state, in effect, that the family court found the stated evidence to be credible evidence of the facts.

### 2.

■ Jane contends that

[t]he use of criminal contempt to charge a violation of a rule of Protective Supervision is not statutorily authorized by HRS Chapter 571. Instead, HRS § 571–50 [7] clearly sets forth the procedural mechanism to be used by the Family Court to adjudicate violations of Protective Supervision. Moreover, the preamble to HRS Chapter 571 states that "no child shall be charged with crime or be convicted in any court except as otherwise provided in this chapter[.]" HRS § 571–1.

Further, prohibiting the use of contempt proceedings to review violations of conditions of Protective Supervision is consistent with the analogous procedural situa-

---

**7.** HRS § 571–50 (Supp.2000) states, in relevant part, as follows:

**Modification of decree, rehearing.** Except as otherwise provided by this chapter, any decree or order of the court may be modified at any time.

At any time during supervision of a child the court may issue notice or other appropriate process to the child if the child is of sufficient age to understand the nature of the process, to the parents, and to any other necessary parties to appear at a hearing on a charge of violation of the terms of supervision, for any change in or modification of the decree or for discharge. The provisions of this chapter relating to process, custody, and detention at other stages of the proceeding shall be applicable.

tion in adult criminal proceedings where violations of probationary conditions are not adjudicated as contempt but probation violation.

Furthermore, other jurisdictions have ruled that the juvenile court may not use [the] contempt sanction to "bootstrap" a status offense into a law violation.

(Footnote added, citations omitted.)

Recently, in the case of *In re Jane Doe, Born on June 16, 1983,* 96 Hawai'i at 81, 26 P.3d at 570, the Hawai'i Supreme Court stated that "HRS chapter 571 does not expressly bar the family court from dealing with violators of court orders of protective supervision under its inherent authority to punish contempts and its jurisdiction over 'law violators' in HRS § 571–11(1)." The court held that "the family court may adjudicate and punish status offenders in violation of a court order of protective supervision under HRS § 571–11(1)." [8] *Id.* at 82, 26 P.3d at 571. However, the court stated that

> in line with other courts, we impose several limitations on the family court's contempt powers. First, the minor must receive sufficient notice to comply with the court's order and must understand its terms and operation, in particular, the possibility of secure detention for disobedience. Second, the court must consider less restrictive alternatives and determine them ineffective or inappropriate. While the court need not necessarily have attempted lesser penalties before imposing secure confinement, the record should indicate that lesser alternatives were considered by the juvenile court before ordering incarceration. Third, contact between the minor and juvenile delinquents convicted of other crimes must be kept to a minimum. These protective conditions strike the appropriate balance between the competing policies of limiting the secure detention of status offenders and preserving the dignity and authority of the family court.
>
> . . . .

The record contains no information on the conditions of secure detention and separation between Doe and juvenile delinquents convicted of other crimes; . . . . We emphasize, however, the necessity of such arrangements in order to uphold the legislature's policy of separate treatment of status offenders and juvenile delinquents.

*Id.* at 82–83, 26 P.3d at 571–72 (footnotes, internal citations, and quotation marks omitted).

One of the precedents relied on by the court was *In re Michael G,* 44 Cal.3d 283, 243 Cal.Rptr. 224, 747 P.2d 1152 (1988), which states, in relevant part, as follows:

> . . . [T]he *Ronald S.* holding . . . does not answer the question of whether a juvenile court is prohibited . . . from ordering the secure, nonschool-hours detention of a contemptuous status offender without converting the youth into a [law violator].
>
> . . . .
>
> . . . [T]here is nothing in that [legislative] history which specifically indicates that the Legislature intended to prohibit a juvenile court from enforcing obedience to a court order through a contempt sanction that does not alter the status of the ward.

*Id.* at 1158–59 (footnotes omitted.) In other words, in California, a status offender who is found to have been in contempt of court does not thereby become a law violator but may be ordered into confinement.

The last sentence of the Hawai'i Supreme Court's opinion in *In re Jane Doe, Born on June 16, 1983* quoted above suggests that Hawai'i follows California in this regard. Referring to the requirement that "contact between the minor and juvenile delinquents convicted of other crimes must 'be kept to a minimum[,]'" the court spoke of "the necessity of such arrangements in order to uphold the legislature's policy of separate treatment of status offenders and juvenile delinquents." This suggests that a minor adjudicated under HRS § 571–11(1) to have been in contempt of a court order of protective supervision

---

8. The legislative history of HRS Chapter 571 clearly states that "although the intent . . . is to clearly afford extensive opportunity and programs for rehabilitating juveniles in trouble, its thesis also includes the position that our laws are intended to have substantial preventive influence by their inherent punishment that is sufficiently buttressed by certainty of imposition." Hse. Conf. Comm. Rep. No. 85–80, in 1980 House Journal, at 1136.

remains a status offender and does not thereby become a juvenile delinquent.

However, other parts of the opinion indicate quite clearly that Hawai'i does not follow California in this regard. In this context, we refer to the following parts of the opinion quoted above:

> HRS chapter 571 does not expressly bar the family court from dealing with violators of court orders of protective supervision under its inherent authority to punish contempts **and its jurisdiction over 'law violators'** in HRS § 571–11(1).
>
> [T]he family court may adjudicate and punish status offenders in violation of a court order of protective supervision **under** HRS § 571–11(1).
>
> [C]ontact between the minor and juvenile delinquents convicted of **other crimes** must "be kept to a minimum."
>
> The record contains no information on the conditions of secure detention and separation between Doe and juvenile delinquents convicted of **other crimes**[.]

(Emphases added.)

Most conclusively, in *In re Jane Doe, Born on June 16, 1983*, 96 Hawai'i at 74, 26 P.3d at 563, the Hawai'i Supreme Court affirmed "the July 1, 1998 findings, order, and decree of the family court of the first circuit finding [Doe] in criminal contempt for violating a[n] order of protective supervision issued by the family court."

In other words, in addition to the category of minors who are status offenders as defined in HRS § 571–11(2) and the category of minors who are law violators as defined in HRS § 571–11(1), the Hawai'i Supreme Court has segregated a category of minors who are law violators as defined in HRS § 571–11(1), but whose law violations are contempts of court for failing to comply with one or more rules of protective supervision ordered by the family court while the minors were status offenders.

The only difference between the instant case and *In re Jane Doe, Born on June 16, 1983*, is that, in the instant case, the DOE's Rules of Protective Supervision (RPS–DOE)

were not ordered. Specifically, the following statement in the RPS–DOE was not ordered: "IF YOU FAIL TO OBEY THE ABOVE RULES, YOU MAY BE ORDERED TO PERFORM COMMUNITY SERVICE. MAJOR VIOLATIONS MAY RESULT IN DETENTION." In *In re Jane Doe, Born on June 16, 1983*, however, the fact that Doe testified that she understood that "DETENTION" referred to being "put into DH" [9] did not deter the Hawai'i Supreme Court from deciding that Doe understood "the possibility of secure detention for disobedience." In the words of the court,

> [i]ndeed, neither set of rules contained reference to "contempt of court," but simply explained that Doe must follow the rules and that failure to do so might well result in more severe measures, which Doe admitted that she understood to include secure detention. Under these circumstances, we hold that Doe had sufficient notice and understanding of the terms of the orders of protective supervision to be convicted of criminal contempt.

*Id.* at 83, 26 P.3d at 572.

## CONCLUSION

Accordingly, based on the Hawai'i Supreme Court's opinion in *In re Jane Doe, Born on June 16, 1983*, we affirm the family court's August 5, 1998 Findings of Fact and Conclusions of Law; Order Adjudicating Minor a Law Violator.

---

**9.** "DH" means "Detention Home." *See* n. 5, *supra.*